# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

_____

John Doe and Jane Doe,

               Plaintiffs,

vs.

Shaun E. LaDue, individually and in his
official capacity as Chief of Police of
the Owatonna Police Department;
Ricardo Magana, individually and in
his official capacity; Tim Hassing,
individually and in his official capacity;
Mike Earl, individually and in his
official capacity; Willie Goodsell,
individually and in his official capacity;
Jay Matejcek, individually and in his
official capacity; John Roes I through V
individually and in their official
capacities; and the City of Owatonna;

               Defendants.

Court File No. 07-cv-02190 (DSD/SRN)

**PLAINTIFFS' MEMORANDUM OF
LAW IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

_In a government of laws, existence of the government will be imperiled if it fails to
observe the law scrupulously._[1]

## INTRODUCTION

      Acting without statutory or other legal authority, the Chief of Police of the City of
Owatonna, Shaun E. LaDue, has directed his police officers to deprive law abiding registered
predatory offenders living within Owatonna of their rights to be free from unreasonable search
and seizure, their right to procedural due process, and their right to equal protection. The
policies adopted by Chief LaDue and implemented by him and his officers require such citizens,
regardless of risk level, to submit to random quarterly seizures of their persons at their home

---

[1] _Olmstead v. United States_, 277 U.S. 438, 485, 485 S. Ct. 564, 575 (1928), Brandeis, J., dissenting.

even though they are not suspected of having committed any crime. The policies also require such citizens to allow officers entry onto their home and then submit to random photographing of their person and vehicles. Not only are such onerous burdens not authorized by Minnesota's Predatory Offender Registration laws, but none of the process due predatory offenders under Minnesota law is afforded to such citizens of Owatonna before they are subject to increased burdens.

Plaintiffs now seek a preliminary injunction prohibiting Defendants from pursuing such unconstitutional policies pending the final determination of this litigation. Rather, Plaintiffs ask that Defendants be held to those measures specifically authorized by Minnesota Statute § 243.166.

## FACTS

On September 20, 1991, John Doe was convicted of one count of a lewd act upon a child in violation of § 288(a) of the California Penal Code.[2] Mr. Doe was place on probation for five years. He was also subject to a lifetime requirement that he register as a sex offender under § 290 of the California Penal Code.[3]

John and Jane Does' lives in California fell apart as a result of Mr. Doe's conviction.[4] The couple, together with their two children, therefore moved to Owatonna, Minnesota in or about May of 1992 in an effort to rebuild their lives as law abiding citizens.[5] John and Jane Doe found a lovely home in Owatonna.[6] The couple were able to secure good employment, raise their children, contribute to the community, and otherwise be law abiding citizens of Owatonna.[7]

---

[2] See Plaintiffs' verified Complaint, hereafter "Complaint" at paragraph 15.
[3] Complaint paragraph 16.
[4] See Affidavit of Jane Doe at paragraphs 2-3.
[5] Complaint paragraph 17.
[6] See Affidavit of Jane Doe at paragraph 3.
[7] See Affidavit of Jane Doe at paragraphs 3-4.

After moving to Minnesota, John Doe registered as a predatory offender fulfilling the requirements of Minnesota Statute § 243.166, subd. 1b(b)(1).[8]  Mr. Doe's risk level status as determined by the Minnesota Department of Public Safety, Bureau of Criminal Apprehension (BCA), was "not assigned."[9]  John Doe also met all the predatory offender registration requirements of Minnesota Statute § 243.166, subd. 4 and 4a.[10]  He initially registered by providing his fingerprints, and photograph and information regarding his whereabouts, residences, places of employment and make and models of his vehicles.[11]

Each year thereafter he dutifully completed the Address Verification Form sent to him by the BCA.[12]  For over thirteen years, John Doe did exactly what he was required to do by Minnesota Statutes.  The Does' were able to peaceably and quietly enjoy their lives in Owatonna.[13]

All of this changed after Defendant Shaun E. LaDue became Chief of the Owatonna Police Department (OPD) on or about December 15, 2004.[14]  For reasons that have yet to be explored or determined, Chief LaDue decided to "crack down" on law abiding predatory offenders living in Owatonna by adopting and implementing policies of "active" compliance or verification of registration information.[15]  The policies are applied to all predatory offenders living in Owatonna regardless of risk level, even those whose status was risk level "not assigned"

---

[8]  Complaint paragraph 18.
[9]  See Complaint paragraph 19, see also Exhibit 1 to Affidavit of Frederick J. Goetz.  As will be discussed in greater detail in the argument portion of this memorandum, there are four risk level statuses under Minnesota law: not assigned, risk level I, risk level II, and risk level III.  See Minnesota Statute § 244.052, subd. 3(e) and subd. 3a(e).
[10]  Complaint paragraph 20.
[11]  Id.
[12]  Id.  See also Goetz Affidavit Exhibit 1.  The Exhibit provides an example of the letter Mr. Doe received from the BCA along with the forms he needed to complete and return to them within ten days.
[13]  Complaint paragraph 24.
[14]  Complaint paragraph 25.
[15]  Complaint paragraph 26.

such as John Doe.[16]  The policies included going to the home of any predatory offender, without

prior announcement, on a random quarterly basis throughout the year.[17]  OPD Officers

demanded face to face contact with the individual at their home and thereafter demanded that

they verify the identification and registration information supplied to the BCA.[18]  One time per

year, again on a random basis, OPD officers go to a registered predatory offender's home and

demand that the person submit to photographing of their person and all of their vehicles.[19]  An

individual is subject to arrest and felony prosecution if they do not comply with every OPD

demand under the "active verification" policy.

The Does' were directly and irrevocably injured by these policies.  Beginning in 2005 at

various and random times throughout the year, uniformed OPD police officers driving marked

squad cars would come to the Does' residence.[20]  The officers demanded to meet personally with

John Doe.[21]  The Does' were advised that officers would keep coming back to their home until

they met with John Doe and he fully complied with their demands.[22]  Members of the OPD also

made it very clear that John Doe would be arrested and prosecuted for allegedly violating his

predatory offender registration requirements if he did not submit to the officers' demands that he

provide in home identification and verification and allow annual photographing of his person and

vehicles.[23]  It was also made plain to both John and Jane Doe that they would have to submit to

such random inspections at their home and that John Doe could do nothing to mitigate the

negative social stigma and de facto community notification that resulted from such continual

---

[16] Complaint paragraph 27.
[17] Id.
[18] Id.
[19] Complaint paragraph 27b.
[20] Complaint paragraph 28.
[21] Complaint paragraph 33, 39, 40, 46, and 47.  See also Affidavit of John Doe at paragraph 3.
[22] Complaint paragraphs 39 and 40.
[23] Complaint paragraph 32, 33, and 34.

police presence such as voluntarily going down to the police station for the verification and photographing.[24]

The policies at issue have resulted in the following instances wherein the Does' were subject to intrusions upon their liberties by OPD Officers well beyond those authorized by Minnesota law:

- Sometime after Defendant LaDue implemented the policies at issue, Jane Doe went to meet with him to express her concerns about how the actions of OPD officers in implementing the policies were destroying the Does' quiet enjoyment of their home.[25] Chief LaDue's response was to threaten Ms. Doe that the OPD would "go to the neighbors" if the Does did not fully comply with all demands.[26]

- In December of 2005, uniformed OPD Officers driving marked squad cars made at least four to six visits to the Does' home during a one week period. The visits were at all hours of the day and night including one at approximately 9:55 p.m. on December 16, 2005.[27]

- On May 31, 2006, at approximately 13:20 hours, OPD Officer Ricardo Magana, Badge No. 7143, in uniform and driving a marked squad car, appeared at the Does' home. He parked his car outside of the home and walked up to the front door. He spoke with Jane Doe. He directed her to have her husband call an OPD shift supervisor immediately.

- John Doe called the OPD later that day as he ordered. He was told he had to remain at his house and submit to a police visit there. This forced John Doe to cancel a scheduled business meeting. Officer Magana, again in uniform and driving a marked squad car,

---

[24] Complaint paragraph 35. See also Affidavit of John Doe at paragraph 5.
[25] Complaint paragraph 36.
[26] Id.
[27] Complaint paragraph 38.

then drove back to the Does' residence. He demanded that Mr. Doe identify himself and verify the information he had supplied to the BCA in his annual registration verification form. He also demanded that Mr. Doe submit to photographing of his person and all of his vehicles. Mr. Doe was forced to let the officer enter his home in order to complete the photographing as the Does' neighbors had already witnessed this police contact and John Doe wished to avoid any further display of the police presence.[28]

- Between November 10 and 12, 2006, uniformed OPD Officers driving marked squad cars made seven unannounced visits to the Doe home. The officers demanded to meet with John Doe at his home and indicated they would keep coming back until this was accomplished. The officers also demanded that Doe submit to photographing of his person and allow officers access to photograph his vehicles. The officers made direct contact with Mr. Doe on November 12, 2006 at approximately 3:20 p.m. Mr. Doe complied with the officers' demands at this time. The officers involved in the incidents included Defendants Magana, Hassing, Earl, and Goodsell.[29]

- The Does' were next subject to an unannounced visit by the OPD at their home on March 16, 2007. Again, a uniformed police officer driving a marked squad car came to the Does' home and parked in front of their residence. He walked up to the door and banged loudly for approximately one minute. John Doe was not home at the time. The officer remained parked in front of the home for some minutes thereafter and then left.[30]

- At 6:50 p.m. the next day, March 17, 2007, another uniformed OPD Officer driving a marked car came and parked in front of the Does' home. The police presence was clear

---

[28] See Complaint paragraph 39. See also Goetz Affidavit Exhibit 2.
[29] Complaint paragraph 40. See also Goetz Affidavit Exhibit 3.
[30] Complaint paragraph 41.

to the Does' neighbors who were outside of their homes at the time. The marked squad car remained parked there for some time and then left.[31]

- On March 18, 2007, at approximately 8:00 p.m., yet another OPD Officer, in uniform, driving a marked squad car, came and parked in front of the Does' residence. The marked squad car remained parked there for approximately 20 minutes and then left.[32]

- At approximately 11:00 a.m. the following day, March 19, 2007, yet another uniformed OPD Officer driving a marked squad car came and parked across the street from the Does' home. He came to the Does' door, knocked, and, after a short wait, left. John Doe was not home at the time.[33]

- Another uniformed OPD Officer driving a marked squad car came to the Does' home the next day, March 20, 2007, at approximately 8:45 p.m. John Doe was not at home at the time. The officer pounded loudly on the door. He waited for a short while and then left.[34]

- On March 21, 2007, the sixth day in a row, at approximately 5:45 p.m., another uniformed OPD Officer driving a marked squad car came and parked in front of the Does' residence. He came to the front door and knocked. Jane Doe answered. The officer asked if John Doe was home. Jane Doe told the officer he was not and that he was out of town. The officer asked whether the trip was business or vacation and when John Doe would return.[35]

- Ten days later, on March 31, 2007, shortly before 1:00 p.m., a marked OPD squad car pulled into the Does' driveway. Mr. Doe was just in the process of backing out of his

---

[31] Complaint paragraph 42.
[32] Complaint paragraph 43.
[33] Complaint paragraph 44.
[34] Complaint paragraph 45.
[35] Complaint paragraph 46.

garage. The officer blocked Mr. Doe's means of egress. The officer walked up to Mr. Doe and informed him that officers had been to his residence at least eight times since March 16, 2007. The officer told Doe he was there for his "compliance check" and would have to confirm Doe's address, license plate numbers of any vehicles that he owned, examine his person for any tattoos or scars and confirm his home phone and work phone. Mr. Doe was told that if he declined to comply with any of these demands criminal charges would be filed against him. Doe was told to contact an OPD shift supervisor the following Monday. During the five minutes that this encounter lasted, members of the general public were able to and did observe the uniformed officer's contact with Mr. Doe including a motorist who was driving down the Does' street and stopped near the end of the Does' drive to gawk at the interaction between Mr. Doe and the uniformed police officer.[36]

- John Doe contacted the OPD shift supervisor the following Monday, April 2, 2007, as he had been directed to do. Mr. Doe spoke with a Sergeant Tim Hassing. Sergeant Hassing confirmed that Doe would be prosecuted if he did not fully submit to these "compliance checks." Sergeant Hassing told Doe they would be doing these checks every 90 days. Fully believing he would be prosecuted if he did not do so, Doe then complied fully with this "compliance check."[37]

- On June 12, 2007, Owatonna Police Department Corporal Rob Kniefel came to the Does' home. For the first time, this Owatonna Police Officer was not in uniform and drove an unmarked vehicle. Kniefel told Mr. Doe he was there for his "compliance check" and would have to verify his information and obtain a photograph. Also for the first time,

---

[36] Complaint paragraphs 47, 48, and 49.
[37] Complaint paragraph 50.

Corporal Kniefel told Doe that he could either complete the compliance check at his home or he could come down to the police station. Doe was allowed to contact his legal counsel before submitting to this compliance check.[38]

- John Doe next spoke with Corporal Kniefel on the morning of June 13, 2007. The purpose of this conversation was to arrange a time for Doe to come to the OPD and complete the "compliance check." Doe was then told by Corporal Kniefel, however, that the compliance check <u>had</u> to be completed at Doe's residence. Doe was told he would be arrested and subject to prosecution if he did not comply.[39]

- As it was plain to John Doe that he would be arrested and prosecuted if he did not comply with all demands of the OPD, he allowed Corporal Kniefel to have access to his home on June 13, 2007, at approximately 1:30 p.m. Corporal Kniefel then went into Does' residence, took photographs of his person, and left.[40]

The Does' lives, including the quiet enjoyment of their home, have been irrevocably injured by the omnipresent threat that the OPD will show up at their door and demand that John Doe submit to the next "compliance check."[41] The Does are unable to have friends, family, or business associates over to their home as they wish for fear that the visits will be interrupted by a police officer pounding at their door.[42] Moreover, the open, obvious, and continually reoccurring police presence at their home has irreparably injured the Does' ability to quietly and peacefully live in their neighborhood.[43] The actions of the OPD pursuant to the policies at issue

---

[38] See Affidavit of John Doe at paragraph 3.
[39] See John Doe Affidavit paragraphs 4-5.
[40] See Affidavit of John Doe at paragraph 6.
[41] See Complaint paragraphs 51, 52, 53, and 54. See also Affidavit of Jane Doe at paragraph 5.
[42] Id.
[43] Id. See also Complaint paragraph 31.

have resulted in the Does' community effectively being notified that the Does are dangerous criminals; why else would the police need to come to their home all the time.[44]

## ARGUMENT

*A preliminary injunction should issue prohibiting the Defendants from engaging in any measures to enforce Minnesota Statutes § § 243.166 and 244.052 beyond those specifically authorized by these Statutes. The extra statutory measures followed by Defendants against the Does have irrevocably injured them by, among other things, depriving them of rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. The balance of equities so favors the Plaintiff, that a preliminary injunction should issue stopping such constitutional violations until the conclusion of this litigation.*

## 1. Standards for issuance of a preliminary injunction.

Four familiar factors guide the Court's determination of whether a preliminary injunction should issue. The factors are: (1) is there a substantial threat that the movant will suffer irreparable harm if relief is not granted, (2) does the irreparable harm to movant outweigh any potential harm that granting a preliminary injunction may cause the non-moving parties, (3) is there a substantial probability that the movant will prevail on the merits, and (4) the public interest.[45] The moving party bears the burden of proving these factors.[46] No single factor is controlling and the Court must balance all four factors in determining whether an injunction should issue.[47]

---

[44] Id.
[45] *Dataphase Sys, Inc. v. C.L. Sys., Inc.* 640 F.2d 109,114 (8th Cir. 1981) (en banc).
[46] *Watkins, Inc. v. Lewis*, 346 F.3d 841,844 (8th Cir. 2003).
[47] *Baker Elec. Co-op, Inc. v. Chaske*, 28 F.3d 1466,1472 (8th Cir. 1994).

A preliminary injunction is an equitable remedy which seeks to prevent irremediable injury and preserve the status quo before claims can be fully investigated and adjudicated.[48] As the *Dataphase* court explained:

> At base, the question is whether the balance of equity so favors the movant that justice requires the Court to intervene to preserve the status quo until the merits are determined. The equitable nature of the proceeding mandates that the Court's approach be flexible enough to encompass the particular circumstances of each case.[49]

## 2. Plaintiffs continue to suffer irreparable harm.

The threat of irreparable harm to the movant is perhaps the most important factor.[50] No further showing of irreparable harm is necessary when a deprivation of constitutional rights is involved.[51] The threat of irreparable harm is also established when a Plaintiff is faced with a choice of exercising his constitutional rights or being subject to criminal penalties if he does so.[52] Ongoing violations of the Fourth Amendment's prohibition against unreasonable search and seizure in particular constitute irreparable harm warranting injunctive relief.[53]

John and Jane Doe have and will continue to suffer irreparable harm as a result of the Defendants' challenged actions and policies. Plaintiffs have alleged a violation of their Fourth Amendment right against unreasonable search and seizure, their Fourteenth Amendment right to procedural due process and their Fourteenth Amendment right to equal protection of the law. Plaintiffs contend that the Defendants' actions and policies of "active verification" not only violate these rights and deprive the Plaintiffs of the quiet and peaceful enjoyment of their home,

---

[48] *Dataphase*, 640 F.2d at 113; Wright, Miller, & Kane, Federal Practice and Procedure Section 2947 (2 ed. 1995).
[49] *Dataphase*, 640 F.2d at 113.
[50] *Watkins, Inc.*, 346 F.3d at 844; Wright, Miller & Kane, at Section 2948.1
[51] *Wright, Miller, & Kane*, at Section 2948.1. See also *Bloom v. O'Brien*, 841 F. Supp. 277 (D. Minn. 1993); *Spring Tree Apartments, ALBIC v. Livingston Perish Council*, 207 F.2d 507 (M. D. La., 2001); *McClendon, v. City of Albuquerque*, 272 F. Supp. 2d 1250, 1259 (D.N.M., 2003); *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861, 867 (8th Cir. 1977).
[52] *Bloom*, 841 F. Supp. at 279.
[53] *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996) and authority cited therein.

but place John Doe in the untenable position of choosing to exercise his rights or be subject to arrest and prosecution. As was the case just last week, John Doe was told in no uncertain terms that if he did not submit to a compliance check, provide the officers his identity and other verification information and submit to photographing, all at his home thereby relinquishing his Fourth and Fourteenth Amendment rights he would be arrested and prosecuted.

The threat of ongoing irreparable harm is real and immediate. The conduct of the Defendants ever since Shaun E. LaDue has been Chief of Police of the Owatonna Police Department establishes unequivocally that Plaintiffs' rights will again be violated in September of this year if the Court does not act. These violations will continue to happen every 90 days thereafter unless the Plaintiffs' motion for a preliminary injunction is granted. A preliminary injunction should issue until the Plaintiffs' claims can be thoroughly investigated and adjudicated.

**3. The irreparable harm the Plaintiffs are certain to suffer outweighs any potential harm that granting a preliminary injunction will cause the Defendants as granting the motion will in fact result in no harm to them.**

The Defendants will suffer no harm if the Court grants a preliminary injunction and limits Defendants to specifically what Minnesota Statutes allow them to do in enforcing Minnesota's Predatory Offender Registration laws. For over thirteen years before Shaun LaDue became chief of police for Owatonna, John Doe was always in compliance with every requirement placed upon him as a predatory offender. The Does have lived in their same house for over fifteen years now. John Doe has sent in his Annual Verification Forms to the BCA as required every year. There is absolutely no reason to believe the Defendants will have any difficulty confirming that

John Doe has been in compliance and truthful if the Court issues the requested preliminary injunction. The balance of harm tips decidedly in favor of the Plaintiffs.

**4. There is a substantial probability that Plaintiffs will prevail on the merits.**

The "substantial probability" factor is not one of mathematical probability, but rather is a question of whether the Plaintiffs have a "fair chance of prevailing" after discovery and a full trial.[54] This factor must be examined in the context of the relative injuries to the parties and the public.[55] As the Eighth Circuit has explained:

> If the chance of irreparable injury to the moving should relief be denied is outweighed by the likely injury to other parties should the injunction be granted, the movant party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less….[W]here the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.[56]

Plaintiffs brings five claims in this case. Count I is a *Monnell* claim against the City of Owatonna and its Chief of Police, Shaun E. LaDue. The substantive constitutional violations underlying the *Monnel* claim are at Count II, unreasonable search and seizure in violation of the Fourth Amendment; Count III, denial of procedural due process under the Fourteenth Amendment; and Count IV, denial of equal protection under the Fourteenth Amendment. There is a substantial probability that Plaintiffs will prevail on every one of these claims.

a.  Unreasonable search and seizure in violation of the Fourth Amendment.

The Fourth Amendment violations at issue date back to December of 2005 and continue to the present time. They come in two forms: warrantless seizure of John Doe's person and warrantless entry into the Does' home.

---

[54] *Heartland Acad. Cmty. Church v. Waddle*, 335 F.3d 684,690 (8th Cir. 2003).
[55] *Dataphase*, 640 F.2d at 113.
[56] Id.

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated." [57]"[T]he Fourth Amendment protects people, not places."[58] The Fourth Amendment is a personal right and an individual must invoke its protections.[59]

While not every encounter between a police officer and a citizen constitutes a seizure under the Fourth Amendment,[60] it does apply to all seizures of the person, even those involving only a brief detention short of traditional arrest.[61] The test for whether such an encounter results in a seizure "… is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would 'have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'"[62] An example of circumstances indicating a seizure is when an officer uses language or a tone of voice indicating compliance with the officer's request might be compelled.[63] A Fourth Amendment seizure also occurs when a police officer requires an individual to identify themselves and threatens arrest or a prosecution if they do not comply.[64]

John Doe was seized on each occasion when an OPD officer went to his home and demanded that he identify himself and/or submit to photographing or he would be arrested or prosecuted. This occurred in December of 2005, on or about May 31 of 2006, on or about November 12, 2006, on or about March 31, 2007, on or about April 2, 2007, and on or about

---

[57] U.S. Const., Amend. IV
[58] *Katz v. United States*, 389 U.S. 347,351, 88 S. Ct. 507, 19 L. Ed. 2d. 576 (1967).
[59] *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S. Ct. 469, 142 L. Ed. 2d. 373 (1998).
[60] *United States v. Barry*, 394 F.3d 1070, 1074 (8th Cir. 2005).
[61] *Davis v. Mississippi*, 394 U.S. 721, 89 S. Ct., 1394, 22 L. Ed. 2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1. 16-19, 88 S. Ct. 1868, 1877, 20 L.Ed. 2d 889 (1968).
[62] *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382 (1991); *Michigan v. Chesternut*, 486 U.S. 567, 569, 108 S. Ct. 1975 (1988).
[63] *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870 (1980).
[64] *Brown v. Texas*, 443 U.S. 47, 50, 99 S. Ct. 2637 (1979); *Vickroy v. City of Springfield, Missouri*, 707 F.2d 853, 854 (8th Cir. 1983).

June 12, 2007. Mr. Doe's liberty was also restrained during these encounters due to the requirement of the OPD that all compliance checks must occur at Doe's residence. John Doe is thus seized for purposes of the Fourth Amendment approximately every 90 days under the challenged policies.

Any seizure under the Fourth Amendment must be reasonable.[65] The reasonableness of a seizure that is less intrusive than a traditional arrest "depends 'on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers.'"[66] This balancing entails weighing "the gravity of the public concern served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty."[67] A central concern in this balancing is assuring "that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field."[68] Thus, to be reasonable, a seizure must either "be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or … the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers."[69]

In *Justin v. City of Los Angeles*, the Plaintiffs sought a Temporary Restraining Order (TRO) prohibiting the Defendants from continuing claimed harassment of homeless persons in sections of downtown Los Angeles under a crime fighting campaign.[70] The Plaintiffs claimed that the Defendants stopping homeless individuals who had not been suspected of any criminal

---

[65] *Brown v. Texas*, 443 U.S. at 50.
[66] Id; citing *Pennsylvania v. Mimms*, 434, U.S. 106, 109, 98 S. Ct. 330, 332 (1977); *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 94 S. Ct. 2574, 2578-79 (1975).
[67] *Brown v. Texas*, 443 U.S. at 50-51.
[68] *Brown v. Texas*, 443 U.S. at 51.
[69] Id.
[70] 2000 WL 1808426 (C.D.Cal. 2000).

activity, demanding identification, and threatening them with arrest if they did not comply, violated the individual's Fourth Amendment right against unreasonable search and seizure.[71]

The Court granted the motion for the TRO finding that Plaintiffs were likely to succeed on their Fourth Amendment claims.[72]  The Court applied the Supreme Court's balancing test in *Brown* emphasizing in particular that the balance between the public's interest and an individual's right to personal security and privacy tilts in favor of freedom from police interference in the absence of any individualized suspicion of misconduct.[73]  Thus, the Court found that the Defendants' interest in fighting crime was outweighed by the individual's Fourth Amendment rights. The Court therefore concluded that Plaintiffs succeeded in showing a likelihood of success on the merits of their Fourth Amendment claim.[74]

As were the *Justin* Plaintiffs, John Doe was never suspected of committing crime before any of the challenged seizures.  In particular, there has never been any suspicion that he has not been in full compliance with his registration obligations under Minnesota Statute § 243.166.  He has dutifully fulfilled these obligations since moving to Minnesota in 1992.

The Defendants' recognized interest in public safety is outweighed by John Doe's Fourth Amendment rights.  The public safety concerns are common to any municipality whether it be in the State of Minnesota, California, Texas, or any other state.  As in *Brown* and *Justin,* these interests do not outweigh the individual Fourth Amendment rights involved here.

Jane Doe and John Doe have also been deprived of their fundamental Fourth Amendment right to the privacy of their home.  Individuals have a well recognized reasonable expectation of

---

[71] Id. at p. 9.
[72] Id.
[73] Id. at 8-9; citing *Brown v. Texas*, 443 U.S. at 52.
[74] Id.  See also *Easyriders Freedom F.I.G.H.T. v. Hannigan*, Supra (permanent injunction issued against California Highway Patrol prohibiting enforcement against certain motorcyclists under California's Helmet Law where policy for enforcement violated the Fourth Amendment); *Lewis v. Kugler*, 446 F.2d 1343 (3d. Cir. 1971) (remanding case for consideration of issuance of preliminary injunction where Plaintiffs claim that New Jersey State Troopers pattern and practice of stopping certain motor vehicles violated Fourth Amendment).

privacy in their own homes.[75]   A warrantless entry into a home to effect a seizure violates the

Fourth Amendment absent exigent circumstances.[76]   The Eighth Circuit has adopted the

following statement as an "eloquent description of the importance of the sanctity of the home":

> A man can still control a small part of his environment, his house; he can retreat
> thence from outsiders, secure in the knowledge that they cannot get at him
> without disobeying the Constitution.  That is still a sizeable hunk of liberty worth
> protecting from encroachment.  A sane, decent, civilized society must provide
> some such oasis, some shelter from public scrutiny, some insolated enclosure,
> some enclave, some inviolate place which is a man's castle.[77]

The manner and frequency of law enforcement intrusion upon protected privacy interests

can rise to the level of harassment thereby constituting an unreasonable search or seizure that

violates the Fourth Amendment.  This was the holding of the Ninth Circuit Court of Appeals in

the case of *Benigni v. City of Hemet*.[78]   The Plaintiff in *Benigni* was the owner of a bar and

restaurant in Hemet, California.  The Plaintiff claimed that the manner and frequency of bar

checks at his business by officers of the local police department violated his Fourth Amendment

right against unreasonable search and seizure and his Fourteenth Amendment rights to due

process and equal protection.  Benigni brought suit under 42 U.S.C. § 1983.  The Defendants

appealed to the Ninth Circuit after a jury verdict in the Plaintiff's favor in all respects.  The Ninth

Circuit affirmed.  As to the Fourth Amendment claim in particular, the Court found that the bar

checks were unreasonable because of the manner in which they were performed and their

frequency.[79]

The policies of the City of Owatonna and Chief of Police LaDue and the actions of OPD

Officers pursuant to such policies have resulted and will continue to result in unreasonable

---

[75] *United States v. Karo*, 468 U.S. 705, 104 S. Ct. 3296 (1984*); Payton v. New York*, 445 U.S. 573, 100 S. Ct. 1371 (1980).
[76] *United States v. Houle*, 603 F.2d 1297, 1299 (8th Cir. 1979).
[77] *Houle*, 603 F.2d at 1301; citing *United States v. On Lee*, 193 F.2d 306, 315-16 (2d. Cir.)(Frank, J., dissenting); aff'd. 343 U.S. 747, 72 S. Ct. 967 (1952).
[78] *Benigni v. Coty of Hemet*, 879 F.2d 473 (9th Cir. 1989).
[79] Id. at 477.

intrusions into Jane and John Doe's expectation of privacy in their home. This results from both the physical entry of OPD Officers into the Does' home to complete their "compliance checks" as well as the manner and frequency in which these checks are performed.

The Does are subject to these compliance checks every 90 days. The evidence shows that OPD Officers, in uniform and driving marked squad cars, keep coming back to the Does' home again, again, and again, until they meet personally with John Doe and take his photograph. The police department's policies mandate that such compliance checks violate the Fourth Amendment as they have to be conducted at the Does' home. John Doe does not have the option of scheduling the compliance checks at the police station and thereby mitigating the degree of intrusion.

The Does have absolutely no advance warning of when an OPD Officer is going to show up at their home during the next 90 day cycle. They can thus either attempt to go about their lives as normal and risk a recurring and obvious police presence outside their front door until John Doe happens to be there when the officers arrive, or have John Doe effectively be on house arrest at any time when he thinks the officers may next come to his home.

Given the primacy which the Fourth Amendment places on protection of the home, this case presents a stronger claim of Fourth Amendment violations than was affirmed in *Benigni*.

The manner and frequency of the intrusions are also unreasonable as they are well beyond those authorized by Minnesota Statutes. A predatory offender whose risk level is "not assigned" such as John Doe has the following requirements under Minnesota Statute § 243.166:

- He must initially register with an assigned corrections agent or the law enforcement authority that has jurisdiction in the area of his primary address.[80]

---

[80] Minn. Stat. § 243.166, Subd. 3.

- The individual must then provide a fingerprint card, a photograph of their person taken at the time of initial registration, as well as information consisting of their primary address, all secondary addresses in Minnesota, the addresses of all Minnesota property owned or rented, the addresses of all locations where they are employed, the addresses of all schools where they are enrolled, and the year, model, make, license plate number, and color of all motor vehicles owned or regularly driven by them.[81]

- The individual must give written notice of any new primary address at least five days before they start living there. They must also give written notice that they are no longer living or staying at an address immediately after they are no longer living or staying there.[82]

- As long as they are subject to the requirements of § 243.166, they must complete a verification form mailed to them by the BCA at their last reported primary address every year. The form must be returned to the BCA within ten days of receipt and must include information on the individual's current and last address of residence and the other information required under subdivision 4a.[83]

- The law enforcement authority may require that the individual appear before the agent or authority to be photographed.[84]

As John Doe has the status of risk level "not assigned," more onerous statutory requirements do not apply to him. These included the following:

---

[81] Minn. Stat. § 243.166, Subds. 4 and 4a.
[82] Minn. Stat. § 243.166 Subd. 3(b).
[83] Minn. Stat. § 243.166, Subd. 4(e)(1)(2).
[84] Minn. Stat. § 243.166, Subd. 4(d).

- A person whose status is a risk level II or III under Minnesota Statute § 244.052 must have annual in person contact with a law enforcement authority. Within one month of that person's birthdate, the person shall report to the authority to verify the accuracy of their registration information and to be photographed.[85]

- Those persons whose status is a risk level III under § 244.052, must appear before the agent or authority at least every six months to be photographed.[86]

- Individuals whose status is a risk level I, II, or III are subject to various levels of disclosure of registration information to the public. For individuals whose status is risk level III, this includes disclosure of information regarding their predatory offender status and other information to members of the community where they live.[87]

Without any statutory authority, the Defendants require quarterly in person meetings with John Doe at his home. Nowhere within the statutory scheme regarding predatory offenders is such manner or frequency of police contact contemplated or authorized. § 243.166, Subd. 4(e) specifically provides that the annual verification of the required information is to be done by mail. While the law enforcement authority may require that a person submit to photographing, the statute specifically provides that the individual will "appear before the agent or authority to be photographed."[88]

Plaintiffs have had the case reviewed by an expert in the area of sex offender registration and community notification laws, Professor Wayne A. Logan of Florida State University. Based on his preliminary review of the case, Prof. Logan concludes that Defendants' actions and

---

[85] Minn. Stat. § 243.166 Subd. 4(e)(3).
[86] Minn. Stat. § 243.166 Subd. 4(d)(1).
[87] Minn. Stat. § 244.052 Subd. 4.
[88] Minn. Stat. § 243.166, Subd. 4(d).

policies are inconsistent with and not authorized by Minnesota's Predatory Offender Registration laws. Moreover, Prof. Logan concludes that such policies are inconsistent with the goal of public safety. Indeed, the Defendants' actions and policies may in fact <u>impede</u> public safety by discouraging sex offender rehabilitation and eroding their willingness to follow registration laws.[89]

The actions and policies of the Defendants which purport to be in the name of enforcing § 243.166, are in fact arbitrary, unbounded, and unreasonable. They only serve to subject the Does to continual violations of their Fourth Amendment rights and do little to advance the interests of public safety. The Plaintiffs have shown that they are likely to prevail on their Fourth Amendment claim.

b. <u>Procedural Due Process Claim</u>

Section 1 of the Fourteenth Amendment to the United States Constitution also provides that "nor shall any State deprive any person of life, liberty, or property without due process of law."[90] There are two steps to a procedural due process analysis: the Court must first determine whether the Defendants deprived the Plaintiffs of a protected liberty or property interest, and if so, the Court assesses what process was due.[91]

The Defendants' actions and policies deprive Plaintiff John Doe of his liberty interest in not having his person subject to unreasonable seizure. The actions and policies also interfere with Jane and John Does' liberty or property interests in the quiet enjoyment of their home. Both

---

[89] See Affidavit of Wayne Logan, p. 7-19.
[90] U. S. Const., Amendment 14, Section 1.
[91] *Kentucky Department of Corrections, v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 1908 (1989).

of these deprivations or interferences satisfy the first step of the procedural due process analysis.[92]

The first step of the analysis is also satisfied as Defendants actions and policies result in de facto community notification that a dangerous person, if not a predatory offender, lives in the Does' residence and distinctly alter John Doe's previously recognized legal status.[93]  While damage to reputation is not in and of itself sufficient to trigger procedural Due Process protections, the procedural guarantees contained in the Due Process clause are invoked when the state action at issue also results in a right or status previously recognized by state law being distinctly altered or extinguished.[94]  This so called "stigma plus" test has two requirements.

First, the Plaintiff must show that the state action has resulted in stigma, that is in some "public opprobrium" or damage to reputation.[95]  The persistent, reoccurring, and obvious police presence at the Does' home certainly damaged their reputation.  The Does' neighbors as well as other people just driving down their street have witnessed these interactions over the years.  Just this past spring, in a clear "gawker's stop," someone stopped their car at the end of the driveway and stared at the then ongoing interaction between John Doe and a uniformed OPD Officer.  The Does are likely to be able to establish that their reputation has been damaged if they have not established this already.

The "plus" part of the test is also satisfied given that the Defendants' actions and policies have effectively altered John Doe's status from that of a risk level "not assigned" to a risk level II or III.[96]  This occurred when, under the threat of arrest and prosecution, John Doe was forced

---

[92]  See *Munoz Arill v. Maiz*, 992 F. Supp. 112 (D. Puerto Rico, 1998); (finding Plaintiffs had stated a cognizable property interest in the quiet use and enjoyment of their property for purposes of procedural due process analysis).
[93]  See Logan Affidavit. p. 28-31.
[94]  *Paul v. Davis*, 424 U.S. 693, 711, 96 S. Ct. 1155 (1976).
[95]  *Bohn v. County of Dakota*, 772 F.2d 1433, 1436 n. 4 (8th Cir. 1985), cert denied, 475 U.S. 1014, 106 S. Ct. 1192 (1986).
[96]  See Logan Affidavit, p. 24-30.

to comply with requirements beyond those authorized for other predatory offenders under Minnesota Statute § 243.166 whose risk level was not assigned.[97]

In *Creekmore v. Attorney General of Texas*, a convicted sex offender claimed, among other things, that his right to procedural due process was violated and therefore sought to enjoin enforcement of Texas Sex Offender Registration Program (TSORP) against him.[98] Creekmore was convicted in a general court martial of several sex offenses under the Uniform Code of Military Justice. He received a six year sentence in the custody of the federal Bureau of Prisons. He was eventually released from the Federal Correctional Complex in Beaumont, Texas. He thereafter lived in the City of Beaumont. Following his release he was ordered by the local law enforcement authority to comply with the TSORP under the threat of arrest and prosecution. The Texas authorities provided no process to Creekmore whatsoever before subjecting him to the TSORP requirements.

The Court found that imposing these requirements on Creekmore under the threat of prosecution constituted a change in his legal status.[99] Because Creekmore did have a "colorable claim" that his military offenses did not subject him to registration under TSORP, the Court found he was entitled to due process before state authorities could require him to register and subject him to other requirements.[100] The Court thus found that Creekmore's liberty interest was infringed without due process of law.[101]

The defendants actions and policies enacted and pursued since December of 2005 have changed John Doe's legal status by placing requirements on him well beyond those authorized

---

[97] Id.

[98] *Creekmore v. Attorney General of Texas*, 341 F.2d 648 (E.D. Tex. 2004).

[99] Id at 665.

[100] Id. at 665-66; distinguishing *Conneticut Department of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003).

[101] Id. at 666; see also *Doe v. Pryor,* 61 F.2d 1224 (M.D. Ala., 1999) (finding that Plaintiff, convicted of federal offense of receiving child pornography, was entitled to preliminary injunction precluding enforcement of state Community Notification Act where no open fact finding procedure was available to the Plaintiff before being subject to such requirements).

by Minnesota Statute § 243.166. He is now subject to mandatory in person identification and questioning at his home by law enforcement every 90 days. He must now allow police officers to photograph his person and his vehicles at least once a year. This also must take place at his home. If John Doe fails to comply with any of these requirements, he is subject to arrest and prosecution.

The requirements resulting from Defendants' actions and policies are well beyond those considered by the Eighth Circuit Court of Appeals in *Gunderson v. Hvass*.[102] While the Eighth Circuit found that the requirements imposed upon someone required to register under § 243.166 were minimal, the Court only considered those strictly allowed by the statute itself.[103] *Gunderson* does not control here as John Doe is subject to much greater and onerous burdens than considered in that case.[104] John Doe has identified a tangible, protectable property interest invoking the protections of the Due Process Clause.[105]

Having shown that the Does were deprived of a protected liberty or property interest without due process of law, the question now becomes what process was due. This is determined by applying the well established test of *Mathews v. Eldridge*.[106] There are three factors to be considered in determining what process is due:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interests through the procedures used, and appropriate value, if any, of additional or substitute procedural safeguards; and finally, the government's interests including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.[107]

---

[102] *Gunderson v. Hvass*, 339 F.3d 639 (8th Cir. 2003).
[103] Id. at 644-45.
[104] *Boutin v. LaFleur*, 591 N.W. 2d. 711 (Minn. 1999); is also distinguishable on this basis. It is worth noting that three of the seven justices of the Minnesota Supreme Court who decided *Boutin* would have found that the consequences and requirements of 243.166 in and of themselves were significant to trigger procedural due process protections.
[105] Id. at 720-21, Anderson, P.,J., dissenting joined by Page and Lancaster, JJ.
[106] 424 U.S. 319, 96 S. Ct. 893 (1976).
[107] Id. at 335, 96 S. Ct. 893.

The Does' private interests affected by the official actions are significant. They have a strong interest in not being deprived of the quiet use and enjoyment of their home. John Doe has a strong interest in not being subject to additional onerous legal duties without due process.[108]

The risk of an erroneous deprivation of these interests is high given that the Defendants have not followed <u>any</u> procedural safeguards whatsoever. Minnesota law does provide procedural safeguards before a predatory offender is assigned a risk level I, II, or III status. This includes having the individual's classification questions determined by an end-of-confinement review committee.[109] The safeguards include having an individualized assessment prepared based on established criteria or risk factors evaluated on a set risk assessment scale.[110] The individual offender has a right to be notified of the time and place of the hearing before the committee meets and to be present and heard.[111]

The offender also has the right to administrative review of the committee's decision if they are assigned a risk level of II or III.[112] This administrative review includes a hearing before an administrative law judge at which the offender is present, has the assistance of counsel, and has a right to present evidence and cross examine and call witnesses.[113]

Either before the end-of-confinement review committee or before an administrative law judge, an offender thus would have the ability to challenge their being subject to the requirements of a risk level II or III status by addressing any of the listed "risk factors" or other relevant factors.[114] The statute lists 20 factors which bear upon the classification decision. The factors included the seriousness of the offense, the offender's prior offense history, the

---

[108]  See *Creekmore*, 341 F.2d at 666.
[109]  Minn. Stat. § 244.052, Subd. 3(a).
[110]  Minn. Stat. § 244.052, Subds. 2 and 3d(i) and (g).
[111]  Id.
[112]  Minn. Stat. § 244.052 Subd. 6(a).
[113]  Id.
[114]  Minn. Stat. § 244.052, Subd. 3(g).

offender's characteristics, the availability of community supports to the offender, and whether the offender has indicated or credible evidence in their record indicates that the offender will re-offend if released into the community.[115] If a local law enforcement agency believes an offender from another state now living in Minnesota should be subject to the more onerous requirements of a higher risk level, the law enforcement agency may request that an end-of-confinement review assigning a risk level to the offender.[116] The individual who is the subject of this request would then have the procedural protections of Minnesota Statute § 244.052.

The Defendants did not afford John Doe any procedural protections before distinctly altering his effective risk level status. He was never given an opportunity to challenge why he should be subject to such additional onerous requirements. For example, he never was able to present evidence relevant to the classification decision such as that he has completed all the conditions of his probation and has lived a completely law abiding life for 16 years since his offense. Plaintiffs will likely be able to show that the risk of an erroneous deprivation here is high given that Defendants chose to not follow any procedural safeguards.

The final *Mathews* factor also cuts in favor of the Plaintiffs. The Defendants certainly have a strong interest in keeping the citizens of Owatonna safe. As explained above, however, there are established procedures to be followed before individuals may be subject to increasingly more onerous requirements under Minnesota's Predatory Offender Registration scheme. The procedures are well established and have been in place for years. The burdens on the Defendants in following the existing law are low.[117] Plaintiffs will therefore likely prevail on their procedural due process claim.

c. Equal Protection Claim.

---

[115] Id.
[116] Minn. Stat. § 244.052. Subd. 3a(f).
[117] See *Creekmore*, 341 F.2d at 666-67.

Section 1 of the Fourteenth Amendment to the United States Constitution provides in pertinent part that no state shall "deny to any person within its jurisdiction the equal protection of the laws."[118]  The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike."[119]  State treatment that differs by race, alienage, or national origin or that impinges on personal rights protected by the Constitution is subject to strict scrutiny.[120]  The strict scrutiny test requires the government entity to show that the treatment that burdens the protected right advances a compelling state interest and is narrowly tailored to serve that interest.[121]

An individual's right to privacy in their home is a fundamental one long recognized by our society.[122]  Plaintiffs have shown that the OPD's policies and actions burden their right to privacy in their home.  The strict scrutiny standard should therefore be applied here.

While Plaintiffs recognize that the Defendants have a compelling interest in public safety, they will not be able to show that the challenged actions and policies are narrowly tailored to serve such interest.  Minnesota Statute § 243.166, in its limited and specific registration requirements, is narrowly tailored to serve this compelling state interest.  Defendants' actions and policies go well beyond these narrowly tailored measures.  Plaintiffs have therefore demonstrated that they will likely succeed on their equal protection claim.

**5.  The public interest favors a preliminary injunction.**

Plaintiffs acknowledge that Defendants have a recognized interest in keeping the public safe.  Defendants actions and policies, however, threaten an even greater public interest: ensuring that those charged with upholding the law follow it themselves.  Minnesota law clearly specifies

---

[118] U.S. Const. Amend. XIV, § 1.
[119] *City of Cleburne, Tex. v. Cleburne Living Center*, 473 U.S. 432, 439, 105 S. Ct. 3249 (1985).
[120] Id. at 440.
[121] *Republican Party of Minnesota v. White*, 416 F.3d 738, 749 (8th Cir. 2005).
[122] *Olmer v. City of Lincoln*, 192 F.3d 1176, 1185 (8th Cir. 1999).

what requirements a person classified as a predatory offender must follow based upon their assigned risk level. Minnesota law has specific procedures to be followed in assigning risk level; procedures that allow an individual to challenge a classification and its attendant requirements. The Defendants have chosen not to follow these laws.

Plaintiffs submit that a preliminary injunction should be issued effectively requiring the Defendants to follow the law pending the conclusion of this litigation. Plaintiffs therefore ask that the Court grant their motion.

## CONCLUSION

Defendants' ongoing actions and policies result in persistent deprivations of the Plaintiffs' civil liberties. Because the Plaintiffs' claims are strong, the risk of irreparable injury to them great, and the risk of harm to the Defendants or the public none; the Court should grant the Plaintiffs' motion for a preliminary injunction. The injunction should prohibit Defendants from taking any actions to verify or check John Doe's compliance with Minnesota's Predatory Offender Registration law other than as specifically authorized by Minn. Stat. § § 243.166 and 244.052.

Dated: June 20, 2007                    GOETZ & ECKLAND P.A.


By:  s/Frederick J. Goetz
FREDERICK J. GOETZ (#185425)
Exposition Hall at Riverplace
43 Main Street S.E., Suite 400
Minneapolis, MN 55414
(612) 874-1552
fgoetz@goetzeckland.com

ATTORNEY FOR PLAINTIFFS